Helen J. McDade, DeKalb, Miss., for defendants-appellees.

Eugene Frank STEWART, Plaintiff-Appellant,

v.

BOARD OF TRUSTEES OF the KEMPER COUNTY SCHOOL DISTRICT et al., Defendants-Appellees.

No. 76–4392.

United States Court of Appeals, Fifth Circuit.

Dec. 11, 1978.

Before COLEMAN, CLARK and RUBIN, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Eugene Frank Stewart brought this suit against the Board of Trustees of the School District of Kemper County, Mississippi, alleging that he was unlawfully demoted from the job of principal at West Kemper High School to the job of principal of the West Kemper Elementary School. Stewart,

**1286**

a black, alleged that his transfer from the high school to the elementary school was in violation of Title VII and the "Singleton rules" of this circuit that govern demotions in school districts which are converting to a unitary school system pursuant to court order.[1] The district court, adopting the findings of a magistrate, entered judgment against the appellant Stewart. The court specifically found that Stewart's transfer was made at Stewart's own request and arose out of Stewart's refusal to work in the same building with a certain other administrative official in the school system. Although the finding that Stewart's transfer was voluntary was based on conflicting testimony, there was substantial evidence to support the finding, and we hold that it was not clearly erroneous. Because a voluntary transfer from the high school to the elementary school cannot constitute either a *Singleton* or Title VII violation, we affirm the judgment of the district court.

Prior to 1969, the Kemper County School District operated a dual school system. Whisenton High School was all-black and DeKalb High School was all-white; both schools served grades one through twelve. On November 7, 1969, this court ordered the district to convert to a unitary school system. *United States v. Hinds County School Board*, 423 F.2d 1264 (5th Cir. 1970), amended 433 F.2d 622 (5th Cir. 1970). Pursuant

to that decree, two integrated schools were established in the western district of Kemper County. Formerly all-white DeKalb High became the West Kemper Elementary School and served grades one through four. Formerly all-black Whisenton High became West Kemper High School and it served grades five through twelve.

Prior to the commencement of the 1971–1972 school year, the school district had four men employed under the title of "principal." The plaintiff Stewart and a Mr. Herrington, a white, were principals at the high school and a Mr. Belle, a black, and a Mr. Eldridge, a white, were principals at the elementary school. All four received salaries of $10,000. According to the testimony of Mitchell, the superintendent of education, employment of four principals for the two schools was not economically feasible for the relatively poor school district. Mitchell described the system as "top heavy" with administrators because of the consolidation that resulted under this court's desegregation order. The district did not, however, wish to fire any of the four existing principals.

A reprieve of sorts was granted to the district in the form of a $70,000 federal grant to implement a two-year "Career Education Program" for the school years 1971–1972 and 1972–1973. Eldridge was asked to head the program and agreed to do

---

1. *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1218 (5th Cir. 1970). *Singleton* provided in pertinent part:

If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member[s] to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

Prior to such reduction, the school board will develop or require the development of nonracial objective criteria to be used in se-

lecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

"Demotion" as used above includes any re-assignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period.

so, with the understanding that when the program ended he would be returned to the school district in a principal's position. Eldridge's departure relieved the district of the direct cost of his salary. Belle was made the sole principal at the elementary school. Stewart, who had been principal of the all-black Whisenton school since 1953, remained as principal at the West Kemper High School. Herrington was made assistant principal at the high school. The salaries of all three men remained equal.

The events that precipitated this lawsuit took place in the spring of 1973, near the end of the 1972–1973 school term. Herrington decided to retire from his assistant principal's post at the high school, leaving the system with only two active principals, Belle and Stewart, both black. At the same time, the federally funded Career Education Program was ending, and Eldridge had to be worked back into the system. The ultimate solution reached by the school board was to transfer Stewart to the principal's job at the elementary school and to move Belle from principal at the elementary school to co-principal at the high school. Eldridge was then installed as co-principal at the high school with Belle. As before, the salaries of all three men were equal.

The school district and Stewart have two different versions of how and why these moves occurred. According to the school district, the school board discussed several alternative proposals concerning the best placement of the three men. The proposals included simply putting Eldridge in Herrington's vacant spot as assistant principal to Stewart at the high school, the use of co-principals at the high school, and the creation of a new position for Eldridge entitled "administrative principal," in which Eldridge would have oversight authority over both Stewart and Belle. Stewart, according to the testimony of Superintendent Mitchell, was called into Mitchell's office to discuss these possibilities. Mitchell asserts that at the time of the meeting with Stewart nothing had been decided by the board; the meeting was to apprise Stewart of the problem and to discuss the alternatives with him. The first proposal Mitchell mentioned to Stewart was that of making Eldridge administrative principal, with an office next to Stewart's at the high school. Mitchell testified:

> When I talked to Mr. Stewart he got very upset and he told me that he would not work with Mr. Eldridge in any capacity and he said, "I will not work in the same building with him." "I would prefer the elementary school so I would have no connection with Mr. Eldridge whatsoever." I said, "Mr. Stewart, if you feel that strong about working with Mr. Eldridge I don't blame you and I will ask the Board if they—I will recommend to them that you be principal of West Kemper Elementary School." And so we did and the Board concurred in this and this is what happened and then I recommended Mr. Belle and Mr. Eldridge as co-principals of West Kemper High School and that's the way it came about. (Tr. 93–94).

Mitchell's testimony was basically corroborated by John Dudley, a school board member. Dudley stated that:

> the choice we gave Mr. Stewart was that of being co-principal with Mr. Eldridge and Mr. Stewart told us that he would not work with Mr. Eldridge.

The only discrepancy between Dudley's and Mitchell's accounts was that Dudley claimed that Stewart had actually been offered a co-principalship with Eldridge, while Mitchell testified that only the administrative principal option was mentioned to Stewart, and that Stewart's hostile reaction to even working in the same building with Eldridge pretermitted any further discussion of options. Both school officials agreed that Stewart had said that he would not work with Eldridge in the same building in any capacity.

Stewart's version of the circumstances surrounding the transfer is significantly different. Stewart testified that he was never offered a co-principalship with Eldridge, and that he never stated that he would not work in the same building with Eldridge or that he would not work with Eldridge in any capacity. According to Stewart, at the time of his meeting with Mitchell, he was told that the decision had already been made to place Eldridge above

him as administrative principal. Furthermore, Stewart claims that he was told that Eldridge's secretary would be housed at the high school and Stewart's secretary would be moved across town to the elementary school. Stewart testified that he did not want to be answerable to Eldridge and thus stated to Mitchell that he would rather be the sole principal at the elementary school than be under Eldridge at the high school. When the principalship was offered to him, Stewart agreed to take it and signed a contract for that position, but, under Stewart's version of the transaction, the Board had in effect offered him the ultimatum of transfer or subjection to Eldridge's oversight. Stewart thus regards his transfer as foisted upon him.

There is some corroboration for Stewart's version in the testimony of witnesses Boyd and Clark, both of whom stated that Superintendent Mitchell had informed them that Eldridge would be installed as a superior to Stewart and Belle. There is also evidence that a petition from local residents with over fifteen hundred signatures existed demanding that Stewart not be transferred. It is disputed whether the petition was ever tendered to the school board. Finally, there was some evidence offered by the defendants that Stewart's performance while principal at the high school was in some respects deficient, suggesting that part of the Board's motivation for the personnel shifts was an effort to improve administration at the high school.

The magistrate's opinion reflects a careful weighing of the conflicting testimony. The opinion states:

> It is difficult to ascertain precisely what occurred when faced with such conflicting testimony. This Court, however, having heard and considered the testimony of the various witnesses and observed their demeanor while testifying, is of the opinion that Superintendent Mitchell and School Board Chairman Dudley presented the more accurate account of the events culminating in the transfer of Stewart to the elementary school. The possibility does exist that there developed a complete misunderstanding between Stewart and Mitchell and thereafter Stewart and

the School Board. Nevertheless, it is the finding of this Court that Superintendent Mitchell and the School Board were considering several proposals in the Spring of 1973 to fill the $10,000.00 principalship position made vacant by Herrington's retirement. Furthermore, the Board was obligated to work Eldridge back into the system in a principal's position. The alleged deficiencies on the part of Stewart in the running of the high school were clearly a consideration in the various proposals being considered at that time by the Board. This court finds, however, that no decision had been made concerning the placement of these three individuals at the time Mitchell first discussed with Stewart the possibility of placing Eldridge in an administrative principalship position. This position had not been established at that time and was never established, but was only one of the several proposals under consideration. This Court finds that whether it was due to a misunderstanding on Stewart's part or for some other reason, Stewart did state to Mitchell and thereafter to the Board that he would not work with Eldridge at the high school in any capacity and that he desired to be made the sole principal of the elementary school rather than be required to work with Eldridge. The refusal of Stewart to work with Eldridge thus severely limited the possible alternative proposals being considered by the Board. His request to be moved to the elementary school as sole principal actually presented the only possible solution to a difficult situation. The ultimate placement of Belle, a black, and Eldridge, a white, as co-principals of the high school and Stewart as sole principal of the elementary school was the direct result of Stewart's hostile attitude toward working with Eldridge and his request for transfer to the elementary school.

The district court accepted this reasoned resolution of the conflicting evidence. That choice is not clearly erroneous. That the ultimate solution reached by the Board involved the exchange of positions by two black administrators and a sharing of responsibility between a black and a white at

the high school strongly tends to blunt allegations of racial motivations for the Board's action. There was ample evidence to support the court's determination that Stewart simply could not accept the prospect of working in close proximity to Eldridge, whatever the division of responsibility, and thus asked for the elementary school job. The finding that Stewart's transfer was made at Stewart's own request and arose from hostility toward working with Eldridge totally eliminates any possibility of a legal claim for Stewart against the school board. Since neither *Singleton* nor Title VII can be implicated by such a voluntary transfer, we need not review any of the *Singleton*-related issues decided below.[2] The judgment of the district court is

AFFIRMED.

2. In addition to relying on the factual ground that Stewart's transfer was voluntary, the court resolved a series of *Singleton*-related issues adversely to the plaintiff. It found alternatively that the school district had been "effectively desegregated" and thus no longer governed by *Singleton*, that there was no "Singleton reduction" in personnel, that the transfer did not constitute a demotion, and that it was not necessary under *Singleton* for the Board to establish written objective criteria governing demotions. None of those findings were necessary to the decision once the initial factual determination was made that Stewart voluntarily chose his new position, and we do not reach those findings here. The Title VII aspect of the complaint was not dealt with by the magistrate at any length, was not mentioned by the court, and was not focused on by the parties on appeal. In any event, the factual determination of voluntariness serves to extinguish any possible Title VII or *Singleton* claim.